**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARI LEIGH OLIVER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-17-3234 |
| | § | |
| KLEIN INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**[*]

There is no shortage of lawsuits against school districts and officials alleging constitutional

violations against students, parents, or employees. But it is rare to see a case alleging that a teacher

or school district violated a public school student's First Amendment right not to salute the flag or

pledge allegiance to it. Why? Because the Supreme Court made it clear in 1943, in *West Virginia*

*State Board of Education v. Barnette*, 319 U.S. 624 (1943), that the First Amendment forbids

compelling saluting or pledging allegiance to the flag. The Supreme Court and the lower courts

have since implemented, and elaborated on, the contours of students' free-speech rights in a series

of cases, taking into account schools' interest in maintaining campus discipline. *See Tinker v. Des*

*Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that either

students or teachers shed their constitutional rights to freedom of speech or expression at the

schoolhouse gate."); *Morgan v. Swanson*, 659 F.3d. 359, 375 (5th Cir. 2011) (quoting *Tinker*, 393

U.S. at 509; quotation marks omitted) ("School officials may only restrict . . . private, personal

expression to the extent it would materially and substantially interfere with the requirements of

---

[*] This Memorandum and Opinion cites ECF Docket Entry page numbers except in deposition
citations, which refer to original transcript page and line numbers.

appropriate discipline in the operation of the school, or impinge upon the rights of other students."); *Brinsdon v. McAllen Ind. Sch. Dist.*, 863 F.3d 338, 348, 351 (5th Cir. 2017) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) and *Tinker*, 393 U.S. at 506) ("The First Amendment rights of students 'are not automatically coextensive with the rights of adults in other settings.' . . . Students must be afforded freedom of speech in school, but the right is 'applied in light of the special characteristics of the school environment . . . .'").

If the scarcity of recent free-speech cases[1] on the Pledge of Allegiance is an indication, that case law is well established. Yet here we are. LaShan Arceneaux, the mother of Mari Oliver, sued the Klein Independent School District and several teachers and administrators at Klein Oak High School under 42 U.S.C. § 1983, alleging that they violated Oliver's constitutional rights under color of state law by disciplining and harassing her for sitting silently during the recitation of the Pledge of Allegiance. The plaintiffs allege that the defendants failed to prevent continuing harassment and constitutional violations because they did not discipline teachers and school officials for punishing and harassing Oliver and for allowing other students to bully her for sitting silently during the pledge. The allegations include many incidents of discipline and harassment by four teachers—Stephen Naetzker, Jennifer Walton, Benjie Arnold, and Angie Richard—and a school principal—Lance Alexander—over three-and-a-half years. Arceneaux sued as Oliver's next friend when Oliver was a minor, but Oliver is now an adult.

---

[1] There have been more recent Establishment and Free Exercise Clause cases concerning the United States and Texas pledges' use of the phrase "under God." *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) (holding that a father lacked standing to bring a lawsuit challenging a school district's Pledge of Allegiance policy as a form of religious indoctrination because of the phrase "under God"); *Croft v. Perry*, 624 F.3d 157 (5th Cir. 2010) (upholding a Texas statute requiring school districts to have students recite the United States and Texas Pledges of Allegiance each day, absent a written exemption request from a parent or guardian, against an Establishment Clause challenge).

The plaintiffs allege that Arceneaux notified Klein Superintendent Bret Champion that she had exempted Oliver from observing the pledge and that Klein's response to the harassment was so inadequate as to violate clearly established constitutional rights. The plaintiffs allege that the harassment by teachers and students continued after Arceneaux complained and even after the lawsuit was filed.

In 2018, this court granted in part and denied in part motions to dismiss the second amended complaint. (Docket Entry Nos. 49, 58). The latest pleading, the fourth amended complaint, asserted municipal and individual liability damages and declaratory relief claims for violating Oliver's constitutional rights to free speech, free exercise of religion, and equal protection of the laws. (Docket Entry No. 104). The municipal liability claims are against the Klein Independent School District, Superintendent Bret Champion, Principals Brian Greeney and Thomas Hensley, and Assistant Principal Kimberly Walters. The pending motions are the defendants' motions to dismiss[2] and motions for summary judgment, and the plaintiffs' motion for partial summary judgment. (Docket Entry Nos. 82, 83, 86, 108, 116, 117, 121, 123, 125, 127).

At a March 2020 hearing, the defendants' counsel stated on the record that the court should rely on evidence outside the pleadings and treat the arguments for dismissal as arguments for summary judgment. The plaintiffs' counsel agreed and stated on the record that his clients would not pursue their free-exercise and equal-protection claims, leaving only their free-speech claims. The parties stated that neither side needed to supplement the summary judgment record.

The plaintiffs' free-speech claims are that Naetzker, Walton, Alexander, and Arnold violated Oliver's right not to speak; Arnold and Richard retaliated against Oliver for her protected speech of remaining seated and silent during the pledge; and that the District, Superintendent

---

[2] The motions to dismiss include the motions to dismiss the third amended complaint, which the parties agreed apply to the fourth amended complaint. (Docket Entry No. 112).

Champion, and Principals Greeney, Hensley, and Walters were aware of, but deliberately indifferent to, the alleged constitutional violations. (Docket Entry No. 104 at ¶¶ 115–117). The plaintiffs contend that the defendants' actions "show a long-standing pattern and practice" of mistreating Klein Oak students who abstain from the Pledge of Allegiance. (*Id.* at ¶ 119). The plaintiffs moved for partial summary judgment on their compelled-speech claim against Arnold, as well as a chilled-speech claim against Richard, which was not alleged in the complaint.[3] (Docket Entry No. 117).

Based on the pleadings, the motions and responses, the record, the parties' oral arguments, and the applicable law, the court grants summary judgment on the free-speech claims as to all defendants except Arnold, and denies the plaintiffs' motion for partial summary judgment. The motion to dismiss the claim for injunctive relief, (Docket Entry No. 82), is denied as moot because the fourth amended complaint does not include that claim.[4] The reasons for these rulings are set out in detail below.

## I.     Background

Texas law instructs school districts to require students to recite the United States Pledge of Allegiance and the Texas Pledge of Allegiance each school day. TEX. EDUC. CODE § 25.082(b) (2017). School districts must excuse students from reciting or observing the pledge "[o]n written

---

[3]   The fourth amended complaint does not list Richard as a defendant who compelled Oliver to speak or chilled her speech, but the plaintiffs make those claims at the summary judgment stage. The plaintiffs' counsel stated at the court's March 6, 2020, hearing that the omission of the compelled speech claim was an unintentional oversight and that the defendants had notice of the claim because the plaintiffs pressed it in their opposition to previous motions to dismiss. (*See* Docket Entry No. 54 at 6). For the reasons stated below, the court cannot consider these claims made outside of the complaint, but even if it did, Richard is still entitled to qualified immunity or summary judgment on the merits.

[4]   Otherwise, that motion would be granted because Oliver has graduated from Klein Oak High School and therefore lacks standing to seek injunctive relief. (Docket Entry No. 119-2, Oliver Dep. at 7:9–10); *see Doe v. Marshall*, 622 F.2d 118, 119 (5th Cir. 1980); *Minnifield v. Louisiana Dept. of Educ.*, 229 F. App'x 277, 277 (5th Cir. 2007).

request from a student's parent or guardian." TEX. EDUC. CODE § 25.082(c) (2017). The Klein Independent School District's pledge policy tracks the Texas statute, which Oliver does not challenge on its face. (Docket Entry No. 138-1 at 40). Oliver testified that she refused to stand for or recite the pledge because she disagrees philosophically with the religious portions of the United States and Texas pledges and she believes that many people, especially African Americans, do not receive liberty and justice. (Docket Entry No. 122-2, Oliver Dep. at 21:11–23:2; *see also* Docket Entry No. 104 at ¶ 40). Oliver alleges several instances of harassment by Klein Oak High School employees and students based on her refusal to observe the Pledge of Allegiance.

### A. The 2014 Incidents with Teacher Stephen Naetzker

On November 3, 2014, in Stephen Naetzker's World Geography class, Oliver sat silently during the pledge. (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 179:12–180:11; Docket Entry No. 138-1, Naetzker Dep. (Exhibit H) at 33:8–16). Naetzker referred Oliver to Assistant Principal Kimberly Walters and wrote on a "disciplinary form" that Oliver had refused to stand during the pledge.[5] (Docket Entry No. 138-1 at 66). Naetzker testified in his deposition—Oliver disputes this testimony—that he wrote Oliver up for refusing to stop typing during the moment of silence that follows the pledge and being disrespectful when he spoke with her about it. (Docket Entry No. 137 at 14; Docket Entry No. 138-1, Naetzker Dep. (Exhibit H) at 24:21–30:8).

Oliver testified that Assistant Principal Walters told her that "maybe in [Naetzker's] class, it would just be better to [stand] since he was in the military and he had military service, [and] sitting probably offended him." (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 35:18–20). Oliver also testified that Assistant Principal Walters told her that Naetzker had "the right" to tell Oliver to stand during the pledge because of Naetzker's military service. (*Id.* at 141:7–19).

---

[5] The parties dispute whether filing this form and sending Oliver to Assistant Principal Walters were disciplinary actions. (*See* Docket Entry No. 123 at 13–14; Docket Entry No. 137 at 15).

Assistant Principal Walters testified that she did not recall this conversation or receiving the disciplinary form from Naetzker about Oliver sitting during the pledge. (Docket Entry No. 119, Walters Dep. at 76:19–78:10, 82:13–25). Walters testified that if she had received this form, she would have taken no action against Oliver and would have conferred with Naetzker about the school's pledge policy. (*Id.* at 81:15–23).

Oliver stood for the pledge in Naetzker's class for the rest of the semester. She testified that she was afraid not to because "there was such a bad reaction the first time I did it." (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 37:8–25).

Naetzker testified that before he finished his disciplinary write-up on Oliver, he asked Thomas Hensley, then an assistant principal, about the school's pledge policy. According to Naetzker, Hensley said that "students were supposed to stand but they didn't have to recite it, [and] need a parent permission slip to sit during the pledge." (Docket Entry No. 138-1, Naetzker Dep. (Exhibit H) at 29:3–7); Docket Entry No. 138-1 at 58–59). Oliver disputes this testimony, stating in her deposition that Naetzker sent the disciplinary form to Assistant Principal Walters during the class when Oliver refused to participate in the pledge. (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 26:8–27:14).

### B. The 2015 Incidents with Teacher Jennifer Walton; Arceneaux's November 2015 Email to Oliver's Guidance Counselor and to Principal Brian Greeney

One day in November 2015, Oliver sat during the pledge recitation in Jennifer Walton's journalism class. (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 61:12–24). Walton instructed Oliver to stand. Oliver refused. The parties dispute whether Walton then insisted that Oliver stand or whether Walton said "oh, okay" and moved on. (*Id.*; Docket Entry No. 119-8, Walton Dep. at 41:17–43:13). The parties also dispute whether, a short time later on several different days, Walton again instructed Oliver to stand for the pledge. (Docket Entry No. 119-8,

Walton Dep. at 43:11–13, 45:20–25; Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 62:4–11).

On November 30, 2015, Arceneaux emailed Oliver's guidance counselor, copying Principal Brian Greeney, suggesting that Oliver should drop the journalism class to avoid conflicts with Walton. (Docket Entry No. 138-1 at 77–78). The guidance counselor told Principal Greeney that she had spoken with Oliver about "how to stand and show respect during the pledge while maintaining her rights." (*Id.* at 80). The counselor also told Principal Greeney that she had conferred with Arceneaux, agreed that they would "touch base again before the holiday break" about whether Oliver should drop the journalism class, and that "[Arceneaux] was happy to see [Oliver] resolve this and liked this plan going forward." (*Id.*). Principal Greeney replied, "Great thanks." (*Id.*). Principal Greeney forwarded Arceneaux's email to Assistant Principal Walters and asked her to "take care of this," stating that "[Oliver] does not have to stand or say the pledge." (*Id.* at 77). Assistant Principal Walters told the guidance counselor that she would speak with Oliver, after the counselor reported telling Oliver "to have two days where she could display appropriate respectful behavior"—meaning to stand during the pledge—"and then speak to Ms. Walton." (*Id.*). The plaintiffs indicate that Greeney and Walters should have told the guidance counselor that Oliver had the right to sit and refuse to participate in the pledge. (Docket Entry No. 137 at 20–21, 59).

Assistant Principal Walters met with Walton to discuss Oliver's complaint. Walton told Assistant Principal Walters that she had told Oliver it was "okay" when Oliver refused to stand for the pledge. (Docket Entry No. 119, Walters Dep. at 91:6–14). Assistant Principal Walters testified that, in November 2015, she "could not" reach a conclusion about what had in fact happened, though earlier in the deposition she also testified that she had thought Walton had followed District

procedures. (*Id.* at 87:23–88:2, 96:15–24). She told Walton that Oliver had the right to sit during the pledge. (*Id.* at 96:15–24).

The plaintiffs do not dispute that Assistant Principal Walters reminded Walton of the pledge policy. Oliver testified that despite this reminder, Walton "continued to silently direct [her] to stand for the rest of the semester." (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 69:16–23). After that semester, Oliver dropped Walton's journalism course and took instead Angie Richard's debate class in the spring of 2016. (Docket Entry No. 104 at ¶ 47; Docket Entry No. 122-2, Oliver Dep. at 67:5–7). According to Oliver, that simply created more problems later on.

### C. The Spring 2016 Incident with Principal Lance Alexander

One day during the spring 2016 semester, Oliver was walking down the school hallway and encountered Principal Lance Alexander as the school's intercom was broadcasting the daily Pledge of Allegiance. (Docket Entry No. 122-2, Oliver Dep. at 331:1–12). Alexander instructed Oliver to stop walking during the pledge. (*Id.*). She "paused" momentarily, then kept walking. (*Id.*). Alexander rolled his eyes and made a disapproving noise. (*Id.*). Oliver testified that she spoke to Assistant Principal Walters later that day about the incident and "asked her if [Principal Alexander] could be informed or someone can be informed that [Oliver] do[es] have the right to just not acknowledge the pledge." (*Id.*). The parties do not point to additional summary judgment evidence about this alleged conversation.

### D. The Summer 2016 Conversation Between Arceneaux, Oliver, and Principal Greeney; Assistant Principal Walters's Email to Oliver's Teachers

In the summer of 2016, Oliver and Arceneaux met with Principal Greeney to discuss what steps could be taken to avoid conflicts over the pledge going forward. (*Id.* at 98:24–100:15). Principal Greeney told them that he knew that Oliver had the right to sit quietly and respectfully during the pledge and that he would talk to the teachers about that right during the training taking

8

place before the new school year. (*Id.*). Oliver testified that although she was still treated badly for refusing to say the pledge after this meeting, no teacher tried to force her to stand for the pledge again. (*Id.* at 111:3–8).

Despite this conversation, on August 18, 2016, Assistant Principal Walters emailed all of Oliver's teachers for the upcoming semester, stating that "[Oliver] should stand, but should not be required to recite the pledge." (Docket Entry No. 138-1 at 97). Assistant Principal Walters also told the teachers not to "call [Oliver] out" for remaining silent during the pledge and to discourage students from questioning Oliver's choice because Oliver "is very sensitive to this subject and our goal is to not draw any unnecessary attention to the matter." (*Id.*). Assistant Principal Walters described Oliver as "a very bright young lady that has a ton of potential" and said the teachers would "enjoy having her in [their] classes." (*Id.*).

### E. The November and December 2016 Incidents with Classmate H.R.; Arceneaux's Email to Principal Greeney and Superintendent Bret Champion

On November 11, 2016, in (nondefendant) teacher Juddy Burks's class, Oliver did not stand or say the pledge. (Docket Entry No. 104 at ¶ 54). Oliver's classmate, H.R., "yelled across the room" that Oliver "was rude and disrespectful for not standing and that she should be standing out of respect for veterans." (Docket Entry No. 119-10). H.R. also used Snapchat, a social-media platform, to post that she "couldn't believe students were not standing for the pledge on Veterans Day and that if they didn't like this country they should leave." (*Id.*). Later on November 11, H.R. apologized to Oliver in Assistant Principal Walters's office. (*Id.*; Docket Entry No. 122-2, Oliver Dep. at 73:17–75:16). Assistant Principal Walters's discipline report states that she asked H.R. to delete the Snapchat posts, confiscated H.R.'s phone for the day, and notified H.R. and Oliver's parents. (Docket Entry No. 119-10). Assistant Principal Walters testified that she also told H.R. to have no further contact with Oliver and to respect Oliver's right not to stand for the

pledge. (Docket Entry No. 119, Walters Dep. at 103:23–104:14). Oliver testified that Assistant Principal Walters told H.R. that she would not "face any repercussions or get in trouble" if she apologized to Oliver, and that H.R. continued to harass her after the meeting. (Docket Entry No. 122-2, Oliver Dep. at 73:24–74:11).

On November 14, 2016, Arceneaux emailed Principal Greeney and Superintendent Bret Champion, telling them that Oliver had the constitutional right to not recite the pledge, that the school was failing to address the ongoing conflicts about Oliver's choice, and that school officials had wrongly placed the burden of dealing with the issue on Oliver. (Docket Entry No. 138-2 at 69). Principal Greeney responded, telling Arceneaux that he "had a great conversation" with Oliver and appreciated Oliver's input. (Docket Entry No. 119-4 at 2). He also told Arceneaux that she could "call or email [him] no matter what the issue is day or night." (*Id.*). Superintendent Champion then thanked Arceneaux for reaching out and said, "[i]t's clear that you and Dr. Greeney are in contact, and I know he appreciates the input from your daughter." (*Id.*).

On December 9, 2016, H.R. called Oliver "the bitch who sits for the pledge," or words to that effect. (Docket Entry No. 119, Walters Dep. at 106:14–108:8 (stating that she could not verify H.R.'s exact words); Docket Entry No. 119-10). Assistant Principal Walters gave H.R. a two-day in-school suspension for the comment. (Docket Entry No. 119, Walters Dep. at 108:8–110:7; Docket Entry No. 119-10). After the incident, Assistant Principal Walters and Oliver had a heated conversation with Arceneaux. Walters and Oliver were on the phone in Assistant Principal Walters's office. (Docket Entry No. 119, Walters Dep. at 234:8–235:8, 238:7–242:4; *see also* Docket Entry No. 104 at ¶¶ 61–75). Arceneaux then came to the school and spoke with Principal Greeney. (Docket Entry No. 119-11). Arceneaux stated that she would take legal action. (*Id.* at

15).  At Arceneaux's request, Principal Greeney agreed to remove H.R. from Oliver's classes for the rest of the semester.  (*Id.* at 21; *see also* Docket Entry No. 137 at 23).

At a point he could not recall at his deposition, Principal Greeney contacted Klein Executive Director Debbie Hamilton, who supervised multiple school principals, about Oliver and the pledge.  (Docket Entry No. 119-1, Greeney Dep. at 102:12–103:1, 104:10–107:20).  Principal Greeney testified that Executive Director Hamilton told him to take care of the situation and that Oliver did not have to stand for or say the pledge.  (*Id.* at 106:12–107:20).

### F.    January 2017: Arceneaux Withdraws Oliver from Klein Oak in Favor of Homeschooling

Oliver had knee surgery at an unspecified point in her junior year.  Arceneaux sent a doctor's note to excuse her absences from school from December 30, 2016, to January 3, 2017.  (Docket Entry No. 119-12).  On January 4, 2017, Oliver and Arceneaux intentionally submitted a forged doctor's note to excuse Oliver's absences from January 4 until January 25, 2017.  (Docket Entry No. 119-13; Docket Entry No. 138-2, Arceneaux Dep. (Exhibit AE) at 70:21–71:13).  When school officials determined that the note was fake, Arceneaux had to evaluate Oliver's options in light of her many now-unexcused absences.  (Docket Entry No. 138-2, Arceneaux Dep. (Exhibit AE) at 71:17–74:4).  Arceneaux and Oliver decided that Oliver should be homeschooled for the spring 2017 semester.  (*Id.* at 73:2–9; Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 97:22–98:23).

The fourth amended complaint alleged that the homeschooling decision was "substantially motivated by the treatment [Oliver] had [received] at Klein Oak."  (Docket Entry No. 104 at ¶ 78).  But in her deposition, Arceneaux took responsibility for the forged doctor note and the unexcused absences, and she did not blame the school district for Oliver being homeschooled.  (Docket Entry No. 138-2, Arceneaux Dep. (Exhibit AE) at 73:6–15).

**G.** **Summer 2017: Thomas Hensley Replaces Greeney as Klein Oak Principal; Oliver's Counsel Contacts Principal Hensley; Principal Walters's Meeting with Oliver's Teachers; Oliver Returns to the School; District Holds Training Session on Constitutional Rights**

Hensley replaced Greeney as Klein Oak principal in the summer of 2017. (Docket Entry No. 119-14, Hensley Dep. at 8:19–9:2, 13:13–15). On August 15, 2017, Arceneaux's counsel sent Principal Hensley a letter informing him that Oliver would return to Klein Oak for the 2017-2018 school year and asking Hensley to ensure that the school respected Oliver's constitutional rights. (Docket Entry No. 88-1). Arceneaux testified that Principal Hensley met with her multiple times during his tenure. (Docket Entry No. 119-3, Arceneaux Dep. at 77:15–20).

Around the time Oliver returned to Klein Oak, the District held one of its monthly "collaborative meetings" at which all 47 principals, the "cabinet," the central office, the athletic director, and the superintendent were present. (Docket Entry No. 119-14, Hensley Dep. at 109:18– 110:14). The District's outside counsel made a presentation on constitutional rights and explained to everyone that a student was allowed to abstain from the pledge. (*Id.*). In addition, on August 18, 2017, Assistant Principal Walters held a meeting of Oliver's teachers, including Benjie Arnold, and instructed them that Oliver was not required to participate in the pledge. (Docket Entry No. 138-2, Arnold Dep. (Exhibit S) at 60:22–61:22; Docket Entry No. 138-2 at 99; Docket Entry No. 138-4 at 32).

**H.** **Fall 2017: The Incidents with Teacher Benjie Arnold; Arceneaux Files this Lawsuit**

Oliver took Benjie Arnold's sociology class when she returned to Klein Oak High School. She secretly recorded some of the class sessions, and the parties submitted transcripts and these recordings as exhibits.[6] (Docket Entry No. 126 at 51–52; Docket Entry No. 131; Docket Entry

---

[6] Arnold argues that the transcripts are inadmissible hearsay and that they violate the best-evidence rule. (Docket Entry No. 143 at 11 at n.19). He offers the actual recordings as evidence in support of his

No. 138-2, Arnold Dep. (Exhibit S) at 106:8–107:8). On September 20, 2017, Arnold played the Bruce Springsteen song "Born in the U.S.A.," and told the class to write down how the song made them feel. (Docket Entry No. 126 at 52). He then gave the students a timed assignment to transcribe the Pledge of Allegiance, stating that, because the assignment was written, the students were not actually pledging allegiance to the United States. (*Id.*). Oliver refused, drawing a "squiggly line" instead. (Docket Entry No. 119-2, Oliver Dep. at 218:4–12).

Arnold stated in his declaration that he had given the assignment for years, explaining that its purpose was "not to compel orthodoxy," but rather to illustrate "that people sometimes recite things every day out of habit and without thinking about what they are actually saying." (Docket Entry No. 126 at 6). Arnold emphasized that most students cannot write the words to the pledge even though they recite it daily. (*Id.*). Arnold stated that he pairs the pledge-writing assignment with Springsteen's "Born in the U.S.A." because "many students feel like the song is patriotic, but when directed to pay attention to the words of the song, they feel that the song's lyrics do not reflect a patriotic intent." (*Id.*).

On September 21, 2017, the day after the pledge assignment, Arnold told the class that anyone who did not complete the assignment would receive a zero. (Docket Entry No. 126 at 52). He then embarked on a lengthy, meandering speech quoted later in this opinion. The parties dispute whether Arnold's comments targeted Oliver and generally disparaged people who abstain from the pledge.

On September 29, 2017, Arceneaux emailed Assistant Principal Walters to object to Arnold having a "God and guns mentality" in his class and giving Oliver a zero grade for refusing to write

---

motion for summary judgment, and includes a transcript for "demonstrative purposes." (*Id.*). His objection is overruled; the recordings are also part of the summary judgment record. (Docket Entry No. 126 at 51; Docket Entry No. 131).

the pledge. (Docket Entry No. 138-4 at 11). The parties dispute whether Arnold actually gave Oliver a zero. Arnold denied doing so in an October 2, 2017, email sent to Arceneaux. (*Id.* at 16).

Assistant Principal Walters investigated the complaints against Arnold by interviewing Oliver, speaking with Arceneaux by phone with Oliver and Associate Principal Mandy Nesbit in the office, and interviewing Arnold. (Docket Entry No. 138-4 at 18). Oliver told Assistant Principal Walters that Arnold had given her a zero on the pledge assignment, called her by the wrong name, moved her seat repeatedly because he could not "see her eyes" to see if she was sleeping (despite other students obviously sleeping in class), and made a condescending reference to her debate accomplishments, among other things. (*Id.*). Assistant Principal Walters's investigation report states that Arnold said that he moved Oliver twice to enforce his "classroom rule that he see student[s'] eyes at all times to [keep] them from sleeping."[7] (*Id.*). Arnold again denied that he had given Oliver a zero on the pledge assignment and "expressed concerns about [Oliver] always being on her phone in class." (*Id.*). According to Assistant Principal Walters's report, a zero grade was not written on Oliver's pledge assignment or entered in the school's grading system. (*Id.*). Arnold also denied "making [light]" of Oliver's debate achievements or embarrassing her in front of the class. (Docket Entry No. 138-2 at 99).

Assistant Principal Walters requested a parent-teacher conference. Arceneaux declined. (Docket Entry No. 138-4 at 19). Arceneaux and Oliver also declined Assistant Principal Walters's offer to move Oliver to another class. (*Id.*). Assistant Principal Walters and Associate Principal Nesbit met with Arnold on October 6, 2017, after Arnold's initial interview on October 2. The

---

[7] In his filings in this case, Arnold denies treating Oliver more harshly than other students because of her refusal to write the pledge. Arnold emphasizes that Oliver's October 6, 2017, recording shows that he told another student that he could not see his eyes either. (Docket Entry No. 125 at 12 (citing Docket Entry No. 126 at 56)).

principals told Arnold to: "be neutral in class discussions"; "be sensitive to students' rights in regards to the Pledge"; "[a]ssign alternate work instead of requiring the writing or recitation of the Pledge as needed for any student that may object"; "[m]onitor students by leaving [the teacher's] desk in order to aid in seeing their eyes"; "[i]nteract with Oliver only as necessary as teacher of record"; and "not move her again, [and] instead walk [around] the room to ensure he 'saw students['] eyes at all times.'" (*Id.*; Docket Entry No 138-2 at 99). Arnold agreed to follow these instructions. (Docket Entry No. 138-2 at 99). Assistant Principal Walters also reminded Arnold about the August 18, 2017, meeting in which they discussed Oliver's right to abstain from the pledge, provided Arnold with a written summary of their meetings, and placed a copy of the summary in his personnel file. (*Id.*; Docket Entry No. 138-4 at 19). Finally, Assistant Principal Walters's report states that Walters emailed Arceneaux a copy of Arnold's curriculum and a copy of Oliver's pledge assignment as evidence that Oliver did not receive a zero. (Docket Entry No. 138-2 at 99; Docket Entry No. 138-4 at 19).

Later in October 2017, Arceneaux filed this suit, naming Arnold as one of the defendants. (Docket Entry No. 1). Arnold created a six-page document called "The Truth Lies Herein," setting out his view of what he called the "malicious accusations" and "trail of deception and blatant falsehoods" in the complaint. (Docket Entry No. 138-4 at 21).

On November 1, 2017, Arnold played Christian music in class at the beginning of a unit on suicide. (Docket Entry No. 126 at 9–10; Docket Entry No. 138-4 at 28). Oliver testified that Arnold stared at her during "the whole [entire] song" and that she thought he played the music to retaliate against her. (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 257:9–258:1). Arnold denies this, arguing that he played the music to illustrate that some people turn to religion during

difficult times in their lives; that he had played Christian music for other class sections and in other years; and that he plays many kinds of music in class. (Docket Entry No. 126 at 9–10).

On November 2, 2017, Assistant Principal Walters and Associate Principal Nesbit met with Arnold after Oliver's counsel objected to his use of Christian music. (Docket Entry No. 138-4 at 28). After Arnold admitted to playing Christian music, Assistant Principal Walters reminded him of their previous meetings about Oliver, and "expressed concern" that Arnold had failed to adhere to the directives about being "mindful about [his] instructional practices around topics that would be deemed sensitive to [Oliver]." (*Id.*). Assistant Principal Walters told Arnold that she found his conduct "puzzling," given the lawsuit. (*Id.*). In her report summarizing the meeting, Assistant Principal Walters wrote:

> Klein ISD is an inclusive school district that respects the religious freedoms of its students. Moreover, our constitution prohibits religious indoctrination in the public schools and violation of the Establishment Clause of the First Amendment. State Board of Education Code of Ethics and Standard Practices for Texas Educators Standards 1.7 states that "The educator shall comply with state regulations, written local school board policies, and other state and federal laws[."] When you played Christian music during your class, you violated this standard.

(*Id.*). Assistant Principal Walters directed Arnold to: "stop playing Christian music in [his] class"; "not publicly discuss the lawsuit involving Mari Oliver"; "adhere to all written and verbal directives given to [him]"; and "comply with the expectations of [his] contract as well as the professional Code of Ethics and Standards of Conduct set forth by the State Board of Education in order . . . to maintain [his] employment as an educator in the Klein Independent School District." (*Id.*).

## I. The Fall 2017 Statement by Superintendent Champion; Incidents with Debate Teacher Angie Richard

On October 25, 2017, the day after Arceneaux filed this lawsuit, Superintendent Champion and his assistant exchanged emails about a statement that Champion directed the assistant to

deliver to the Klein Independent School District Board of Trustees.  (Docket Entry No. 138-2 at 86).  The statement informed the Board of the lawsuit, telling the Board members that they "will recall that there was a matter at Klein Oak High School last year regarding a student who opted out of participating in the Pledge of Allegiance and complained of resulting harassment."  (*Id.*). Champion noted that the District had been "contacted by the American Atheists group [representing Oliver], [District counsel] Ellen Spalding responded, and we believed the matter [was] resolved."  (*Id.*).

The same day, Walters told debate teacher Angie Richard not to discuss the lawsuit. (Docket Entry No. 138-1, Walters Dep. (Exhibit O) at 272:3–15; Docket Entry No. 138-2, Richard Dep. (Exhibit T) at 41:24–42:20).  Richard interpreted Assistant Principal Walters's instruction to mean that she should "keep all conversations about the lawsuit out of the classroom."  (Docket Entry No. 138-2, Richard Dep. (Exhibit T) at 42:17–20).  Later that day, when Oliver was sitting in Richard's class in the brief break between classes, another student asked Oliver about the lawsuit.  (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 278:4–21).  Richard intervened and told Oliver and the other student not to discuss the lawsuit in her classroom.  (*Id.*; Docket Entry No. 138-2, Richard Dep. (Exhibit T) at 74:12–76:6).

On Saturday, November 4, 2017, Oliver and another student, J., had an argument at a debate event that Klein Oak hosted.  J. swore at Oliver, who responded by bringing up J.'s recent in-school suspension for lewd conduct.  (Docket Entry No. 128 at 7–8; Docket Entry No. 138-6 at 12).  Oliver reported the incident to Richard, who alerted Assistant Principal Walters, who referred the matter to Assistant Principal Lynda Wesley because she was on campus at the time.  (Docket Entry No. 128 at 7–8; Docket Entry No. 138-6 at 12).  Assistant Principal Wesley had Richard tell Oliver and J. to behave or go home and that Assistant Principal Wesley would address the issue

the following Monday.  (Docket Entry No. 128 at 7–8; Docket Entry No. 138-6 at 12).  Oliver objects to being told to delay making a formal complaint, claiming that the school prioritized preserving its image at the debate event over her problem.  (Docket Entry No. 137 at 37, 55; Docket Entry No. 138-6 at 12).  The plaintiffs allege that Richard's conduct during this incident "typified" Richard's "attitude toward the long history of mistreatment [Oliver] had suffered, including threats she received after filing the present litigation."  (Docket Entry No. 137 at 55).

On January 26, 2018, Oliver told Assistant Principal Walters that Richard had yelled at her, kicked her out of the classroom, and then slammed the door in her face.  (Docket Entry No. 119, Walters Dep. at 259:8–25; Docket Entry No. 119-34 at 2).  Assistant Principal Walters testified that she reviewed the video footage, which showed Oliver simply walking out of the classroom and closing the door behind her.  (Docket Entry No. 119, Walters Dep. at 259:8–25).

Oliver claims that all the defendants violated her First Amendment right to free speech. The defendants moved for summary judgment and asserted qualified immunity.  The evidence, the law, and the arguments and responses are analyzed below.

## II.  The Summary Judgment Evidence

The parties submitted hundreds of exhibits, including:

- letters and emails;

- deposition testimony;

- declarations;

- Klein policy manuals and statements;

- memoranda summarizing meetings involving the parties;

- teacher personnel records;

- transcripts of audio recordings of Arnold's sociology class;

- Oliver's assignment to write the Pledge of Allegiance in Arnold's class; and

- reports summarizing Assistant Principal Walters's investigations of the plaintiffs' complaints.

(Docket Entry Nos. 77-1, 86-1, 88-1, 104-1, 118, 119, 122, 124, 126, 128, 129, 130, 131, 134-1, 135-1, 138).

The court considers the parties' arguments and the summary judgment evidence against the applicable legal standards.

## III. The Legal Standards

### A. The Motion for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine

issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

This Memorandum and Opinion does not examine every factual allegation in the complaint because the plaintiffs discussed and pointed to summary judgement evidence only as to some of their complaint. *See Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 185 (5th Cir. 2018)

(quoting *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.")).

**B.    Qualified Immunity**

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014). "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right." *Id.* (citing *Tolan*, 572 U.S. at 655–56). "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). "A court has discretion to decide which prong to consider first." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently." *Luna*, 773 F.3d at 718. But "[a]s the Supreme Court has recently reaffirmed, 'in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Tolan*, 572 U.S. at 651).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (quotations omitted).

"When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). "To answer that question in the affirmative, [the court] must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.'" *Luna*, 773 F.3d at 724–25 (quoting *Tolan*, 572 U.S. at 657). A plaintiff has the burden of overcoming the qualified immunity defense. *Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

## C.    Municipal Liability

Oliver alleges that Klein Independent School District had a practice or custom of harassing those who refuse to recite or stand for the Pledge of Allegiance. A local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiffs'] injury. . . ." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To recover under § 1983 against a municipality, a plaintiff must "show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). "A policy is official only when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy." *Id.* (quotation omitted). "Although an official policy can render a municipality culpable, there can be no municipal liability unless it is the moving force behind the constitutional violation." *Id.* (citing *Piotrowski*, 237 F.3d at 580). "In other words, a plaintiff must show direct causation, i.e., that there was a direct causal link between the policy and the violation." *Id.* (quotation omitted). If a plaintiff cannot show that the policy itself is facially unconstitutional, he must show the policy was "adopted with deliberate indifference as to its known or obvious consequences." *Id.* (quotation omitted). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *Id.* at 617–18 (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

"Municipal liability cannot be sustained under a theory of *respondeat superior*. . . . '[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of

official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability.'" *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (alteration in original) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Piotrowski*, 237 F.3d at 578).

"Texas law unequivocally delegates to [a school district's] Board [of Trustees] 'the exclusive power and duty to govern and oversee the management of the public schools of the district.'" *Id.* (quoting TEX. EDUC. CODE § 11.151(b) (2017)). "[F]inal policymaking authority in an independent school district rests with the district's board of trustees, not the Superintendent." *Rodriguez v. Hous. Indep. Sch. Dist.*, 710 F. App'x 196, 198 (5th Cir. 2018).

## IV.    Analysis

### A.    Student Speech and the Right to Abstain from the Pledge of Allegiance

A public school student's First Amendment right to abstain from the Pledge of Allegiance is well, long, and clearly established. The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend I. The First Amendment, as incorporated through the Fourteenth Amendment's Due Process Clause, applies to state and municipal governments, entities, and employees. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637–38 (1943). In 1943, the Supreme Court held that a West Virginia public-school regulation requiring students to salute the American flag violated the First Amendment. *Id.* at 642. The Court declared that "the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* In June 2014, approximately three months before Oliver began her studies at Klein Oak High School, the Fifth Circuit discussed an Eleventh Circuit case's application of "the

*Barnette* right to abstain from the pledge" as an example of "[t]he rare exceptions" to the trend "that educators are rarely denied immunity from liability arising out of First-Amendment disputes." *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014).[8]

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). School officials may limit students' private, personal expression to the extent that it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," or "impinge upon the rights of other students." *Morgan v. Swanson*, 659 F.3d 359, 375 (5th Cir. 2011) (quoting *Tinker*, 393 U.S. at 509).

Freedom of speech includes the rights to refrain from speaking and to be free from government retaliation for engaging in protected speech. *Brinsdon v. McAllen Ind. Sch. Dist.*, 863 F.3d 338, 348, 351 (5th Cir. 2017); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). A school official engages in unconstitutional retaliation when, substantially motivated by a student's protected speech, the official takes actions causing an injury that would "chill a person of ordinary firmness from continuing" the protected activity. *Brinsdon*, 863 F.3d at 351*; see also Keenan*, 290 F.3d at 258.

Oliver does not challenge the facial constitutionality of the Texas statute requiring students to say the United States and Texas Pledges of Allegiance unless a parent or guardian requests an exemption in writing, TEXAS EDUCATION CODE § 25.082. The Fifth Circuit has upheld the Texas pledge provision against a facial Establishment Clause attack, and the Eleventh Circuit rejected a

---

[8]  The defendants argue that this passage from *Morgan* is not relevant because the case was not about abstaining from the pledge and because the passage discusses Eleventh Circuit case law. (Docket Entry No. 94 at 7). *Morgan* acknowledges "the *Barnette* right to abstain from the pledge," a right that depends on Supreme Court rather than Eleventh Circuit precedent. *Morgan*, 755 F.3d at 760. Whether or not *Morgan* is on point, the Supreme Court's holding in *Barnette* clearly establishes the right to not say the pledge.

facial free-speech challenge to a comparable Florida statute. *Croft v. Perry*, 624 F.3d 157, 170 (5th Cir. 2010); *Frazier v. Winn*, 535 F.3d 1279, 1284–85 (11th Cir. 2008). The parties and the court presume that the Texas law is constitutional. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969) ("Legislatures are presumed to have acted constitutionally.").

**B.      The Klein Independent School District Pledge Policy**

The District pledge policy tracks the Texas pledge statute. The policy states: "A board shall require students, once during each school day, to recite the pledges of allegiance to the United States and Texas flags. On written request from a student's parent or guardian, a district shall excuse the student from reciting a pledge of allegiance." (Docket Entry No. 138-1 at 40; *see* TEX. EDUC. CODE § 25.082(b)–(c)).

The plaintiffs argue that by failing to give school officials more specific guidance, the Klein pledge policy creates "confusion" that jeopardizes students' right to abstain from the pledge. (Docket Entry No. 137 at 13, 63–67). The plaintiffs cite inconsistent statements by the defendants, such as Principal Greeney's November 2015 email to Assistant Principal Walters stating that Oliver "does not have to stand or say the pledge," and Assistant Principal Walters's August 2016 email stating that "[Oliver] should stand, but should not be required to recite the pledge." (*Id.* at 12).

The plaintiffs have not shown that the brief Klein pledge policy, which tracks the language of the unchallenged state statute, was unconstitutional on its face. For the reasons explained below, the evidence does not support the plaintiffs' theories that the District policy caused the alleged violations of Oliver's free-speech rights or that the District was deliberately indifferent to those rights by failing to adopt additional procedures to implement the pledge policy or take other actions in response to the alleged rights violations. (*See* Docket Entry No. 137 at 61–62). The record

shows that all individual defendants except Arnold are entitled to summary judgment on qualified immunity. Because the individual municipal defendants adequately addressed Oliver and Arceneaux's complaints, including their objections to Arnold's behavior, the plaintiffs have not raised a factual dispute that overcomes the defendants' evidence supporting qualified immunity.

### C. Arceneaux's Request to Exempt Oliver from the Pledge

The plaintiffs argue that Arceneaux's November 30, 2015, email to Oliver's guidance counselor, with a copy to Principal Greeney, and her November 14, 2016, email to Principal Greeney and Superintendent Champion, are effective requests to exempt Oliver from the pledge under the Texas statute. The court finds that the November 2015 email is not an effective exemption request, but the November 2016 email is.

The November 2015 email from Arceneaux reads:

Good morning Mrs. Bollato,

Hope your holidays went well.

I would like to change Mari's second period class from Journalism to Speech and Debate with Ms. Richard. I know it's late in the year. It has come to my attention that Ms. Walton (I would have copied her here, but I could not find her in the directory by name or by searching for Journalism) keeps giving Mari a hard time about not saying the pledge of allegiance in her class. When Mari sits quietly, she complains. When Mari stands silently, she complains. I really don't think berating her in front of her peers and yelling at her is going to really sway Mari into seeing things her way. I think the faculty as a whole should know that students don't have to say the pledge. But, Mari does know that she has to be respectful and she is doing that.

The best workaround I can see is for the move to the speech/debate class. It is in the same period as journalism. Mari is on the debate team and is familiar with the classwork and can make a smooth transition. It seems as if Ms. Walton is uncomfortable having a student in her class that does not say the pledge and Mari is uncomfortable having a teacher yelling, scowling, and looking at her everytime [*sic*] they have to say the pledge in 2nd period.

Please let me know if there is anything I need to do to facilitate this move.

L

(Docket Entry No. 138-1 at 78).

Under Texas law, school districts may not require students with a "written request from a . . . parent or guardian" to recite the United States or Texas Pledge of Allegiance. TEX. EDUC. CODE § 25.082(c). Whether the November 2015 email was an effective exemption request under the Education Code is a close question. The email states that "the faculty as a whole should know that students don't have to say the pledge," and that Mari is choosing not to do so. The email goes on to say that the "best workaround" would be to move Oliver from Walton's journalism class to Richard's speech and debate class. The email proposes a course of action that did not specifically request exempting Oliver from participating in the pledge in Walton or Richard's class. It is implicit, but not expressly requested or stated.

The November 2016 email is clearly an effective exemption request. The email reads:

How can you make an announcement for the dress code/camo issue,[9] but not say something regarding *harassing students who choose not to say the pledge.* And in such an efficient manner.

My issue was never the camo. My issue was with freedom of speech/abstaining from the pledge. Which was dodged in favor of this camo issue. So, you decided to ban camo, then reversed the decision almost immediately???

I was pointing out how kids have the freedom to say whatever they want - you should say the pledge or you are unpatriotic or can even say get the f*** out of the country and post it to the school facebook page. All of these are opinions. And protected freedoms until they use it to oppress someone else.

*My child's desire not to say the pledge is not an opinion, it is a constitutional right.* One that is being hampered time and time again. But, nothing is said about it. Or she is expected to deal with it because she is going against the grain.

---

[9] Klein Oak students were punished after taking a picture posing in camouflage clothing and giving the middle finger in front of the school after President Donald Trump won the 2016 election. (Docket Entry No. 119-1, Greeney Dep. at 126:7–131:10). Arceneaux had drawn attention to the issue by posting the image to the social media profile of a prominent political activist. (*Id.* at 126:13–20).

> The bottom line is when there is a need, Klein Oak seeks to meet that need.  All students at Klein Oak are valued and their opinions are important.
>
> That is what you state.  I don't know how true it is.  It appears you have to be in the majority to get something resolved.
> --
> LaShan Arceneaux

(Docket Entry No. 138-2 at 69) (emphasis added).

This email forcefully defends Arceneaux's child's choice to abstain from the pledge and affirms her right to be exempt from the requirement to do so.  "My child's desire not to say the pledge is not an opinion, it is a constitutional right.  One that is being hampered time and time again."  Arceneaux effectively communicated to Principal Greeney and Superintendent Champion that she, as Oliver's mother, wanted them to protect Oliver's constitutional right to abstain from the pledge.  The parties have not identified case law defining specific requirements for exemption requests under the Texas pledge statute, but the November 2016 email satisfies the statutory text.

The defendants nonetheless dispute whether Arceneaux submitted an adequate exemption request, citing Arceneaux's December 2018 deposition testimony that she did not submit an exemption request in writing because she thought the school knew that she approved of Oliver abstaining from the pledge and because no school official had asked her for a written statement.  (Docket Entry No. 116 at 36–37; Docket Entry No. 119-3, Arceneaux Dep. at 86:25–87:13).  The defendants also cite Oliver's December 2018 deposition testimony that she learned of the parental-exemption-request rule in her junior year and that her mother had not filed a written request.  (Docket Entry No. 119-2, Oliver Dep. at 130:7–131:5, 337:3–13).  Oliver also testified that she "[did not] recall" and "[did not] know" whether Arceneaux had done so.  (*Id.*).

Arceneaux and Oliver's subsequent testimony does not negate the November 2016 email's legal effect under the Texas pledge statute.  A reasonable jury could find that Oliver and Arceneaux

testified honestly in December 2018 and simply did not remember Arceneaux's email from two years earlier.

**D.     The Claims Against Stephen Naetzker, Jennifer Walton, and Lance Alexander**

The court grants summary judgment on the claims against Stephen Naetzker, Jennifer Walton, and Lance Alexander on qualified immunity, because their alleged misconduct occurred before Arceneaux filed a clear written request to exempt Oliver from the pledge in November 2016. The plaintiffs have not cited case law from the time of Naetzker, Walton, and Alexander's alleged misconduct clearly establishing that it was unlawful for those defendants to attempt to enforce a pledge-recitation requirement that tracked a presumptively constitutional Texas statute about an effective exemption request, which the plaintiffs do not challenge.

Even if Arceneaux's November 30, 2015, email was a valid written exemption request under the Texas statute, implicating Walton and Alexander's actions after that email, Walton and Alexander would still be entitled to qualified immunity. The plaintiffs have not identified case law that clearly established the request's validity at the time of Walton and Alexander's post-November 30, 2015, conduct. On the claim against Alexander, the plaintiffs have also not pointed to clearly established law holding that telling a student to stop walking during the pledge, but taking no action to require recitation or even to enforce the stop-in-place comment, is equivalent to instructing the student to participate in the pledge.

**E.     The Claims Against Benjie Arnold**

**1.     The Compelled-Speech Claim**

The parties cross-moved for summary judgment on Oliver's claim that Arnold violated her right to abstain from the pledge by attempting to coerce her and the rest of the class to write the

pledge.  Material factual disputes make summary judgment for either side inappropriate and preclude a ruling that Arnold is entitled to qualified immunity as a matter of law on this claim.

Arnold argues that he was not attempting to instill or require patriotic beliefs, which would violate the Supreme Court's holding in *Barnette*.  (Docket Entry No. 125 at 20).  When he gave the assignment, Arnold said, "[n]ow, this is a written assignment.  It's not meaning that you're pledging to the country, [if] you don't wanna pledge.  This is an assignment to write the words to the Pledge." (Docket Entry No. 126 at 52).  According to Arnold, he had given the assignment for years to "teach students that people sometimes recite things every day out of habit and without thinking about what they are actually saying." (*Id.* at 6).  He paired the assignment with listening to Bruce Springsteen's "Born in the U.S.A." because, although people often assume the song is patriotic, the lyrics suggest a different intent.  (*Id.*; Docket Entry No. 125 at 10).

Given the factual disputes and the many reasonable inferences the record evidence could support, a reasonable jury could come out either way on whether Arnold's assignment was an impermissible attempt to promote patriotism.  A transcript of an audio recording Oliver secretly made on the relevant class days, which Arnold cites for demonstrative purposes, includes the following quotation from Arnold from the day after the assignment:

> Your assignment yesterday was to write the Pledge.  If you have a math class and that teacher gives you 10 problems to do, and you say you don't wanna do 'em, tell me what your grade is[.]  It's a zero.  And you have the option to do that, but what you've done is leave me no option but to give you a zero.  And you can have all the beliefs, and resentment, and animosity that you want.  But I made it clear yesterday: Writing it is not something you pledge.  But again, but I know the sticker's gone – I used to have it, and it said "America, love it, or leave it."  And if you can tell me two countries you'd rather go to[,] I will pay your way there if they're communist or socialist.  Most of Europe is socialist and it's crumbling.  Or it's communism. But if you ever come back you have to pay me twice what it cost me to send you there.  You know there's a lot of things I complain about.  So when it comes time in November I go vote, or I protest in writing, in legal.  Those are the ways we do it in America.  Where a country will crumble is when people coming into a country do not assimilate to that country.  That doesn't mean you forget Day of the Dead,

and whatever cultures[,] you maintain your language. That doesn't mean that. But you're not gonna drive on the left side of the road, and you're not gonna impose Sharia law. Because it's not. [T]his. [C]ountry. But what is happening, and I can say it a lot more than you because I've lived longer. It's almost as America's assimilating to THOSE countries.

(Docket Entry No. 126 at 52–53). The stream of consciousness continues, and, between discussions of the Cuban Missile Crisis and the Pope's position on border walls, Arnold digresses about a sex offender:

Okay, so keep you[r] house when the guy next to you has to put a sign out saying that he's a sex offender. And welcome him to the neighborhood. That's fine. And maybe that person needs that kind of welcome. And if you didn't hear in Houston, there was a – he was a Mariachi teacher. And the Principal[] also got removed. She hired him, but she was paying him out of a different account. Il[l]egal. The guy had about five counts of molestation, lewd exposure to young people, and there he was working in the school system. So you can say "Well, he needs a second chance[."] Tell that to the people that he abused. Tell that to those kids.

(*Id.* at 53).

The parties disagree about whether Arnold was hostile to those who abstain from the pledge and refuse to assimilate into American society. The complaint alleges that Arnold compared people who abstain from the pledge to Soviet communists, supporters of Sharia, and people who condone pedophilia. (Docket Entry No. 104 at ¶ 95). The parties' interpretations of Arnold's remarks inform their arguments about whether the pledge assignment had an impermissible patriotic intent. Oliver and Arnold also dispute whether Oliver's refusal to write the pledge was protected speech or a mere refusal to do coursework. (*See* Docket Entry No. 125 at 23). Granting summary judgment for Arnold on the compelled-speech claim is clearly inappropriate. Granting partial summary judgment for the plaintiffs is a closer question, but the full record at trial will provide a more secure basis for an accurate ruling.

The factual disputes and conflicting inferences preclude granting Arnold qualified immunity as a matter of law. If a jury found that Arnold's pledge assignment was an attempt to

instill patriotism, then Arnold would have violated the clearly established law discussed above in Section IV.A, long after Arceneaux submitted her November 2016 email demanding that the school respect Oliver's right to abstain from the pledge.[10]

## 2.    The Retaliation Claim

Arnold moved for summary judgment on the retaliation claim. (Docket Entry No. 125). Summary judgment is also inappropriate on this claim, as is a finding of qualified immunity as a matter of law.  The parties dispute whether Arnold gave Oliver a zero for failing to complete the pledge-writing assignment, whether he singled her out and treated her more harshly compared to other students, and whether he disparaged her for refusing to say the pledge.  (*Id.* at 11).  As explained above, a reasonable jury could conclude that Arnold exhibited hostility toward, and retaliated against, Oliver for refusing to write the pledge, and that he threatened to give a zero to anyone who refused to write the pledge (whether he acted on the threat or not).  Viewed in the light most favorable to the plaintiffs, the disputed evidence supports denying Arnold's motion for summary judgment and prevents the court from finding, as a matter of law, that he is entitled to qualified immunity.

Arnold argues that he did not direct disparaging comments at Oliver in particular, emphasizing that he generally gave the same lectures to each of his six class periods throughout

---

[10]    Arnold cites *Brinsdon*, 863 F.3d at 343–44, 349, 351–52, which does not help his argument. (Docket Entry No. 108 at 18–20).  *Brinsdon* held that it did not violate the First Amendment to require students in a Spanish class to recite the Mexican Pledge of Allegiance to improve language fluency and increase cultural awareness.  *Brinsdon*, 863 F.3d at 343.  The assignment in *Brinsdon* is not comparable to the compelled recitation or writing of the United States Pledge of Allegiance in an American classroom "for the purpose of teaching, fostering and perpetuating the ideals, principles and spirit of Americanism . . . ." *See Barnette*, 319 U.S. at 625.  The *Brinsdon* court specifically stated that "[i]f there were . . . evidence in this case [that the teacher was seeking to inculcate beliefs by requiring the recital of the Mexican pledge], we would reach the same result the Supreme Court did in *Barnette* . . . .  There is, though, no direct evidence here of a purpose to foster Mexican nationalism.  Instead, the only evidence is that students were, as part of a cultural and educational exercise, to recite a pledge of loyalty to a foreign flag and country." *Brinsdon,* 863 F.3d at 349.  Here, Arnold's comments support a reasonable inference that he wanted his students to write the pledge to instill patriotic beliefs.

the day.  (*Id.* at 10).  This argument does not justify summary judgment because a jury could reasonably conclude that the assignment was inherently designed to instill patriotism or, based on Oliver's testimony, that his disparaging comments were directed at her after she refused to complete it.  A jury could also reasonably find that Arnold's speech to the class and threat to punish refusal to write the pledge with a zero would chill a person of ordinary firmness from exercising protected speech.

Arnold also contends that he cannot be liable because the plaintiffs did not plead that he knew about Arceneaux's written request to exempt Oliver from the pledge.  (Docket Entry No. 94 at 15).  This argument fails because even if Arnold did not know about Arceneaux's exemption request, that would not rebut the plausible allegations that Oliver exercised a clearly established constitutional right, that Arnold was antagonistic and hostile to Oliver in response to her exercise of that right, and that his behavior would chill a person of ordinary firmness.  The summary judgment evidence also establishes that, at the start of the semester, Assistant Principal Walters notified Arnold and Oliver's other teachers of Oliver's protected practice of abstaining from the pledge.  (Docket Entry No. 138-2, Arnold Dep. (Exhibit S) at 60:22–61:22; Docket Entry No. 138-2 at 99; Docket Entry No. 138-4 at 32).

### F. The Claims Against Angie Richard

The plaintiffs argue in their partial summary judgment motion that Richard chilled Oliver's protected speech by preventing her from talking privately about the lawsuit with another student in Richard's classroom during the break between classes.  (Docket Entry No. 117-1 at 21; Docket Entry No. 137 at 54).  They also argue that Richard compelled Oliver to speak by asking her repeatedly about the litigation.  (Docket Entry No. 117-1 at 20).  These legal claims were not raised in any of the complaints.  The plaintiffs failed to give "fair notice of what the . . . claim[s] [are]."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *Sims v. City of Madisonville*, 894 F.3d 632, 643 (5th Cir. 2018) ("Because we conclude that Sims failed to raise this claim in his complaint, we affirm."); (Docket Entry Nos. 1, 16, 37, 77, 104; Docket Entry No. 142 at 7).

The plaintiffs' counsel stated at the summary judgment hearing that the omission of the chilled-speech claim against Richard in the complaint was an unintentional oversight—although it persisted over five versions of the pleading, including the fourth and latest amended complaint—and that Richard had adequate notice of the claim because the plaintiffs noted it in their response to motions to dismiss. In their memorandum of law opposing motions to dismiss the *second* amended complaint, the plaintiffs accused Richard of compelling Oliver to speak and chilling her speech. (Docket Entry No. 54 at 6). That is not sufficient, especially given that the plaintiffs are on their fourth amended complaint. *See Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

Even if the court considered the chilled and compelled-speech claims against Richard, she would be entitled to qualified immunity or summary judgment on the merits, for the reasons explained below. Richard also prevails on the First Amendment retaliation claim, which is in the fourth amended complaint but was barely mentioned at the summary judgment stage.

### 1. The Chilled-Speech Claim

Richard argues persuasively that simply requiring Oliver to refrain from discussing the case in the classroom, but not otherwise, was a legitimate means of avoiding disruption in the educational environment, or at least did not violate clearly established law. (Docket Entry No. 127 at 23 n.15). At the summary judgment hearing, Richard's counsel emphasized that in-class

discussion of the lawsuit could cause tension because the lawsuit involved claims against teachers and administrators. Richard cites Supreme Court and Fifth Circuit case law holding that schools may regulate disruptive student speech in class. *Morgan v. Swanson*, 659 F.3d 359, 407 (5th Cir. 2011) (surveying Supreme Court and Fifth Circuit precedent). The plaintiffs have not demonstrated that preventing Oliver from discussing the lawsuit against the school in a school classroom between classes, and not preventing her from doing so outside of the classroom, violated clearly established law.[11] Nor do the plaintiffs identify clearly established law holding that telling a student to stop talking about something unrelated to the curriculum in the classroom would chill a person of ordinary firmness from exercising protected speech. Richard emphasizes that Oliver went on to discuss the lawsuit "regardless of [Richard's] instruction" and did not face discipline. (Docket Entry No. 127 at 21 n.12; Docket Entry No. 128 at 7). The plaintiffs' citation of general First Amendment case law about students' right to express their views is not enough to overcome the qualified immunity defense, given that the case law also states that teachers may regulate disruptive speech. *See Vann v. City of Southaven, Miss.*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 732–33 (5th Cir. 2016) ("It is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level of generality.'")).

---

[11] The plaintiffs claim that Richard and Assistant Principal Walters's deposition testimony proves that the speech restriction "had nothing to do with potential interference [with] the operation of the school," (Docket Entry No. 137 at 55), but the testimony actually suggests the opposite. (Docket Entry No. 138-2, Walters Dep. (Exhibit O) at 272:3–273:6 ("Ms. Richard [was] trying to discourage disruption against what they were focusing on in class."); Docket Entry No. 138-2, Richard Dep. (Exhibit T) at 41:24–42:20 (explaining that Assistant Principal Walters told her after the litigation began that "the classroom was for the classroom and to keep all conversations about the lawsuit out of the classroom")).

## 2.    The Compelled-Speech Claim

The plaintiffs also contend that Richard violated Oliver's First Amendment right against compelled speech by repeatedly demanding that Oliver discuss the litigation with her after Oliver declined to do so. (Docket Entry No. 117-1 at 20). Again, the plaintiffs failed to plead this claim in the fourth amended complaint. (*See* Docket Entry No. 104; Docket Entry No. 142 at 7); *Sims*, 894 F.3d at 643 ("Because we conclude that Sims failed to raise this claim in his complaint, we affirm."). Even considering the merits of this claim, Richard would still be entitled to summary judgment because the plaintiffs do not identify competent summary judgment evidence supporting it. *Lamb*, 914 F.3d at 946 (quotation omitted) ("A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.").

## 3.    The Retaliation Claim

Qualified immunity bars the plaintiffs' First Amendment retaliation claim against Richard. The plaintiffs do not explicitly discuss this claim in their summary judgment filings, though the court could generally construe their discussion of Richard's response to the dispute Oliver had with another student at a weekend debate event as an attempt to support that claim. The plaintiffs object to Richard relaying Assistant Principal Wesley's statement that she would address the matter when school resumed the Monday after the debate event, and not before. (Docket Entry No. 137 at 55). The plaintiffs' argument does not withstand Richard's qualified immunity defense because the plaintiffs do not explain how Richard's behavior delaying action over the weekend violated clearly established law or why it would chill a person of ordinary firmness from exercising First Amendment rights.

The plaintiffs also assert that Richard "consistently downplayed students' harassment of [Oliver] and cast her as dishonest, including in conversations with [Oliver's] fellow debate team

members." (*Id.*). Richard denies the allegations of retaliation or hostile treatment. (*See generally*, Docket Entry No. 127; Docket Entry No. 142 at 10). Because the plaintiffs do not support these assertions by pointing to competent summary judgment evidence, the retaliation claim does not survive Richard's summary judgment motion. *See Davidson*, 882 F.3d at 185 ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.").

### G.   The Municipal Liability Claim

The competent, undisputed summary judgment evidence establishes that Assistant Principal Walters took steps to address each of Oliver and Arceneaux's concerns and did not act with deliberate indifference. Principal Greeney, Principal Hensley, Superintendent Champion, and Klein Independent School District did not act with deliberate indifference because they acknowledged each of the plaintiffs' complaints and reasonably delegated responsibility for responding to them. The undisputed evidence of the municipal defendants' attention to the plaintiffs' concerns, as the defendants acted under a pledge policy tracking a presumptively constitutional statute, fails to show or support an inference of a widespread practice of harassing those who abstain from the pledge after a parent requests an exemption. Finally, all of the individual municipal defendants are entitled to qualified immunity because the plaintiffs have not shown that they violated clearly established law.

### 1.   The Claim Against Assistant Principal Walters

Assistant Principal Walters argues persuasively that she is entitled to summary judgment because she addressed Oliver's complaints and was not deliberately indifferent to Oliver's concerns. The plaintiffs do not dispute that Assistant Principal Walters:

- investigated Oliver's complaint against Walton and told Walton that Oliver did not have to stand for the pledge;

- facilitated a meeting in which Oliver's fellow student, H.R., apologized to Oliver for insulting her on November 11, 2016;[12]

- imposed a two-day in-school suspension on H.R. for insulting Oliver in December 2016;

- told Arnold and other teachers on August 18, 2017, just before Oliver took Arnold's class, that Oliver had the right to abstain from the pledge;

- reprimanded Arnold for his behavior toward Oliver surrounding the pledge writing assignment;

- told Arnold to: "be neutral in class discussions"; "be sensitive to students' rights in regards to the Pledge"; "[a]ssign alternate work instead of requiring the writing or recitation of the Pledge as needed for any student that may object"; "[m]onitor students by leaving [the teacher's] desk in order to aid in seeing their eyes"; "[i]nteract with Oliver only as necessary as teacher of record"; and "not move her again, [and] instead walk [around] the room to ensure he 'saw students['] eyes at all times.'";

- reprimanded Arnold for playing Christian music after Oliver objected to it; and

- investigated Oliver's complaint that Richard yelled at Oliver and slammed the classroom door in her face, determining based on video footage that Oliver's allegation was false.[13]

The record shows that Assistant Principal Walters was not deliberately indifferent, even though the plaintiffs disagree as to whether she could have done more or better. *See Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely

---

[12] Although Oliver testified that Assistant Principal Walters told H.R. that she would not "face any repercussions or get in trouble" if she apologized to Oliver, (Docket Entry No. 122-2, Oliver Dep. at 73:24–74:11), the plaintiffs' summary judgment response brief appears to concede that Assistant Principal Walters also told H.R. to remove her offensive social media posts about Oliver, confiscated H.R.'s phone for the day, and notified H.R.'s parents of the incident. (Docket Entry No. 137 at 22). Even if the plaintiffs stuck to Oliver's deposition testimony, the undisputed facts do not support finding that Assistant Principal Walters was deliberately indifferent to the November 11, 2016, incident with H.R.

[13] As the plaintiffs' counsel stated at the summary judgment hearing, the fourth amended complaint alleges that the plaintiffs' counsel sent letters to the District's counsel twice in 2018 stating concerns about Richard's allegedly behavior abusive behavior toward Oliver, that the District's lawyer acknowledged receiving these letters, and that the school took no action to respond to the concerns. (Docket Entry No. 104 at ¶¶ 106–111). The court does not credit these assertions because the plaintiffs do not point to competent summary judgment evidence supporting them.

inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity."). Assistant Principal Walters is also entitled to qualified immunity because the plaintiffs have not pointed to case law from the time of her alleged misconduct that clearly established that her many attempts to address Oliver's concerns made her conduct unlawful.

The plaintiffs object in particular to two statements by Assistant Principal Walters. First, Oliver testified that Assistant Principal Walters said that Naetzker had "the right" to tell Oliver to stand during the pledge because Naetzker had served in the military. (Docket Entry No. 138-1, Oliver Dep. (Exhibit A) at 141:7–19). Even if Assistant Principal Walters did say this—she testified that she did not recall the conversation—it is not enough to overcome qualified immunity or create a material factual dispute as to deliberate indifference. At the time of the alleged statement, Arceneaux had not submitted a written request to exempt Oliver from the pledge. The fact that Assistant Principal Walters's alleged statement was incorrect does not make her deliberately indifferent.

The plaintiffs also emphasize that when Assistant Principal Walters emailed Oliver's teachers in August 2016 about her right to abstain from the pledge, Walters erroneously stated, "[Oliver] should stand, but should not be required to recite the pledge." (Docket Entry No. 137 at 12). This statement, though incorrect, is not enough to support an inference of deliberate indifference as opposed to negligence. The rest of the email made it clear that Walters did not want teachers or students to be hostile to Oliver for refraining from standing for, or reciting, the pledge. (Docket Entry No. 138-1 at 97). Walters demonstrated her continued attention to Oliver's concerns by correctly telling teachers before the fall 2017 semester that Oliver did not have to participate in the pledge; by twice investigating complaints against, and reprimanding, Arnold;

and by promptly investigating Oliver's January 2018 allegation against Richard. In addition, no school official directed Oliver to stand for the pledge after Assistant Principal Walters misspoke in August 2016, so her error caused no constitutional violation.

### 2. The Claims Against Principal Greeney, Principal Hensley, Superintendent Champion, and Klein Independent School District

Principal Greeney is entitled to summary judgment and qualified immunity because he met with Oliver or Arceneaux multiple times and tried to resolve their complaints, undermining any inference of deliberate indifference. The plaintiffs agree that Principal Greeney asked Assistant Principal Walters to "take care of" Oliver's problems, and told Assistant Principal Walters that Oliver did "not have to stand or say the pledge." The plaintiffs do not dispute that Assistant Principal Walters took the steps discussed above. The parties also agree that Principal Greeney took steps to remove H.R. from Oliver's classes. This undisputed evidence precludes a finding that Principal Greeney was deliberately indifferent, and supports his entitlement to qualified immunity.

Principal Hensley is entitled to summary judgment and qualified immunity because he also met with Arceneaux multiple times to listen to her complaints. The plaintiffs claim—while also disputing that the conversation happened—that Hensley "reportedly" advised Naetzker incorrectly about the school pledge policy. (Docket Entry No. 137 at 10, 45). Naetzker testified that Hensley said, "students were supposed to stand but they didn't have to recite it, [and] need a parent permission slip to sit during the pledge." (Docket Entry No. 138-1, Naetzker Dep. (Exhibit H) at 29:3–7); Docket Entry No. 138-1 at 58–59). This statement is unclear. Students are supposed to stand and recite the pledge unless a parent submitted an effective written exemption request. Hensley's statement does not show deliberate indifference. Moreover, Assistant Principal Walters

had primary responsibility over Oliver's concerns, and she responded. Her actions preclude finding Hensley was deliberately indifferent.

Superintendent Champion is entitled to summary judgment and qualified immunity because he responded courteously to Arceneaux's November 2016 email and reasonably believed that the other municipal defendants adequately addressed Oliver and Arceneaux's concerns. The plaintiffs have not shown that he was deliberately indifferent or acted unlawfully.

Klein Independent School District is entitled to summary judgment because there is no municipal policy or custom shown and the plaintiffs' claims against the individual municipal defendants fail. The District's decision to have its attorney do a presentation for senior school personnel on constitutional rights, including the right to abstain from the pledge, at the beginning of the fall 2017 semester is among the undisputed facts that undermine a finding of deliberate indifference.

V.    **Conclusion**

Summary judgment on the free-speech claims is granted as to all defendants except Benjie Arnold. The motion to dismiss Oliver's dropped claim for injunctive relief, (Docket Entry No. 82), and the defendants' requests for summary judgment on the free-exercise and equal-protection claims the plaintiffs abandoned at oral argument, are denied as moot. The plaintiffs' motion for partial summary judgment, (Docket Entry No. 117), is denied.

Under the court's second amended scheduling order, which remains in effect, Arnold and the plaintiffs' joint pretrial order and motion in limine deadline is **May 8**, **2020**. Docket call will be held on **May 15**, **2020**. (Docket Entry No. 106).

SIGNED on March 25, 2020, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge